IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

COLUMBUS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) CASE NO. 4:08-CR-00036 |
| | ) |
| VS. | ) FEBRUARY 16, 2010 |
| | ) |
| CURTIS WILLIAMS | ) MOTION TO DISMISS HEARING |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CLAY D. LAND

UNITED STATES DISTRICT JUDGE

Proceedings recorded by mechanical stenography; transcript produced by computer.

BETSY J. PETERSON, RPR, CCR
Federal Official Court Reporter
Post Office Box 81
Columbus, Georgia  31902
(706) 317-3111

1                            APPEARANCES

2

3    FOR THE GOVERNMENT:

4         Assistant U.S. Attorney
          MELVIN E. HYDE, JR.
5         melvin.e.hyde@usdoj.gov
          Middle District of Georgia
6         1246 First Avenue
          Post Office Box 2568
7         Columbus, Georgia  31902-2568
          (706) 649-7700
8

9

10   FOR THE DEFENDANT:

11        Federal Defenders of the Middle District of GA
          CYNTHIA W. ROSEBERRY
12        cynthia_roseberry@fd.org
          MORAD FAKHIMI
13        morad_fakhimi@fd.org
          Suite 400
14        440 Martin Luther King, Jr. Blvd
          Macon, GA 31201
15        (478) 743-4747

16

17

18   COURT REPORTER:

19        BETSY J. PETERSON, RPR, CCR
          Federal Official Court Reporter
20        P. O. Box 81
          Columbus, GA 31902
21        (706) 317-3111

22

23

24

25

1                          EXAMINATION INDEX

2

3    CHARLES FLUELLEN
          DIRECT BY MS. ROSEBERRY . . . . . . . . .    6
4         CROSS BY MR. HYDE . . . . . . . . . . .     10
          REDIRECT BY MS. ROSEBERRY   . . . . . . .   13
5

6    EDWARD LAMAR HEMMINGS
          DIRECT BY MS. ROSEBERRY . . . . . . . . .   14
7

8    ALFREDO V. RODRIQUEZ
          DIRECT BY MS. ROSEBERRY . . . . . . . . .   19
9         CROSS BY MR. HYDE . . . . . . . . . . .     21
          REDIRECT BY MS. ROSEBERRY   . . . . . . .   24
10        RECROSS BY MR. HYDE . . . . . . . . . . .   28
          FURTHER REDIRECT BY MS. ROSEBERRY . . . .   31
11        FURTHER RECROSS BY MR. HYDE . . . . . . .   33
          FURTHER REDIRECT BY MS. ROSEBERRY . . . .   34
12

13   JONATHAN MEMMO
          DIRECT BY MR. HYDE  . . . . . . . . . .     54
14        CROSS BY MS. ROSEBERRY  . . . . . . . . .   62
          REDIRECT BY MR. HYDE  . . . . . . . . .     74
15        RECROSS BY MS. ROSEBERRY  . . . . . . . .   75

16

17

18                          EXHIBIT INDEX

19                                            MAR  /  ADM
     Defendant's
20    1      Customer's service records with account      16
             number
21
      2      Service activation record with address       17
22           and account number

23

24

25

```
 1          (Proceedings on February 16, 2010, commencing at
 2       10:02 a.m., as follows:)
 3             THE COURT:  Please be seated.
 4             Good morning.  This will be in the case of United
 5    States of America versus Curtis Williams, Case 4:08-CR-36.
 6             You, sir, are the defendant, Curtis Williams.  Is
 7    that correct?
 8             THE DEFENDANT:  Yes, sir.
 9             THE COURT:  All right.  And who is present on behalf
10    of the defendant?
11             MS. ROSEBERRY:  Good morning, Your Honor.  Cynthia
12    Roseberry from the Federal Defenders' Office.
13             THE COURT:  All right.  Ms. Roseberry, welcome.
14             MS. ROSEBERRY:  Thank you.
15             MR. FAKHIMI:  Also Morad Fakhimi from the Federal
16    Defenders', Your Honor.
17             THE COURT:  All right.  You're going to have to speak
18    into that microphone so the court reporter can pick that up.
19             Mr. Fakhimi, welcome.
20             MR. FAKHIMI:  Thank you, sir.
21             THE COURT:  And Mr. Hyde is present for the
22    government.
23             We have motions to dismiss the indictment for
24    pre-indictment delay, Document 61; motion to dismiss the
25    indictment pursuant to the Speedy Trial Act, Document 62; and
```

1   motion to dismiss the indictment pursuant to Speedy Trial

2   Clause of the Sixth Amendment.  That's Document 63.

3        The government has acknowledged that the -- there

4   were some delays and that the indictment should be dismissed,

5   but the government maintains that the dismissal should be

6   without prejudice.

7        Is that correct, Mr. Hyde?

8        MR. HYDE:  Your Honor, that's correct, but only

9   insofar as the actual Speedy Trial Act is concerned.  The other

10  two motions to dismiss we do contest, although I can understand

11  the Court would not necessarily reach those other two motions

12  having the government conceding the actual Speedy Trial Act

13  motion.

14       THE COURT:  All right.  Who's going to handle this

15  for the defendant?  Mr. Fakhimi or Ms. Roseberry?

16       MS. ROSEBERRY:  Your Honor, we're going to have some

17  argument and summary from Mr. Fakhimi, and I'll handle the

18  witnesses.

19       THE COURT:  All right.  If the defendant wants to put

20  up evidence, let's go ahead and do that first.

21       MS. ROSEBERRY:  Your Honor, we call Charles

22  Fluellen.

23       THE COURT:  Charles Fluellen.

24       Sir, if you'd come straight ahead to the witness

25  stand.  Just have a seat right there.  Before you do, I'm going

1      to give you the oath.  Would you raise your right hand?

2                CHARLES FLUELLEN, DEFENDANT'S WITNESS, SWORN

3                THE WITNESS:  I believe I do.

4                THE COURT:  All right.  Be seated.  Go ahead and

5      state your name, and spell it for the court reporter.

6                THE WITNESS:  My name Charles Fluellen.  Spelling is

7      F-l-u-e-l-l-e-n.

8                THE COURT:  All right, Ms. Roseberry.

9                MS. ROSEBERRY:  Thank you, Your Honor.

10                          DIRECT EXAMINATION

11     BY MS. ROSEBERRY:

12     Q.  Mr. Fluellen, where do you live?

13     A.  I live at 2309 16th Avenue.

14     Q.  Okay.  And is that here in Columbus?

15     A.  Yes.

16     Q.  Okay.  And how long have you lived there?

17     A.  For 20 years.

18     Q.  All right.  And how old are you now?

19     A.  I'm 54.

20     Q.  Mr. Fluellen, where do you work?

21     A.  McDonald's.

22     Q.  And how long have you worked there?

23     A.  Three years.

24     Q.  And what do you do for McDonald's?

25     A.  I'm a hostess.

1    Q.   Okay.  Mr. Fluellen, do you know a Louis Williams?

2    A.   Yes.

3    Q.   Okay.  And do you know where Mr. Louis Williams is from?

4    A.   I believe he from Alabama.

5    Q.   Okay.  And do you know where 1417 29th Street is?

6    A.   Yes.

7    Q.   Do you know where 1419 29th Street is?

8    A.   Yes.

9    Q.   And how far are they from your house, where you've lived?

10   A.   All the way up the street on 16th, about five blocks.

11   Q.   About five blocks?

12        And, Mr. Fluellen, let me step back and ask you this.  How

13   far did you get in school?

14   A.   I went to the ninth grade.

15   Q.   Now, you said you know Mr. Williams.  What, if anything, do

16   you know about Mr. Williams in connection to 1417 29th Street

17   or 1419 29th Street?

18   A.   I obtained the power bills at both of them address for

19   Mr. Williams.

20   Q.   Okay.  You say you obtained the power bill?

21   A.   Yes.

22   Q.   What do you mean when you say you "obtained the power

23   bill"?

24   A.   I had the power bill put in my name for Mr. Williams.

25   Q.   Okay.  And why did you have the power bills put in your

1   name for Mr. Williams?

2   A.   Because he was just a friend of mine.

3   Q.   Okay.  Now, do you remember when you had those power bills

4   put in your name?

5   A.   It was in 2006.

6   Q.   Okay.  If I showed you a copy of a billing record from

7   Georgia Power, would that help you remember the dates?

8   A.   That would help me a lot.

9           MS. ROSEBERRY:  Okay.  Your Honor, may I approach?

10          THE COURT:  You may.

11      (Document handed to witness.)

12  BY MS. ROSEBERRY:

13  Q.   Mr. Fluellen, I'm going to show you a bill here from 1417

14  29th Street and ask you to look at the service activation date

15  right here.

16  A.   It's 17/9 -- 29/2004.

17  Q.   Okay.  Is that July 29, 2004?

18  A.   Yeah.

19  Q.   Okay.  And is this a bill that you had put in your name?

20  A.   This was a bill was in my name.

21  Q.   Okay.  And now I'm going to show you a bill from -- that

22  was 1417; this is 1419 29th Street -- and ask you if you see

23  that date.

24  A.   The fifth, 10, 2006.

25  Q.   Okay.  Do you wear glasses?

1  A.  Yes.

2  Q.  You don't have your glasses here today?

3  A.  No.  No.

4  Q.  Okay.  So could that be May 30 instead of May 10, 2006?

5  A.  Yeah, May 30, 2006.

6  Q.  Okay.  Thank you.

7      Mr. Fluellen, do you know if the houses at 1417 29th Street

8  and 1419 29th Street are still standing?

9  A.  No, they been torn down.

10 Q.  Okay.  And do you know whether Mr. Williams is still alive

11 or not?

12 A.  I heard that he deceased.

13 Q.  Okay.

14      MS. ROSEBERRY:  May I have a moment, Your Honor?

15      THE COURT:  Yes.

16   (A discussion was held off the record.)

17 BY MS. ROSEBERRY:

18 Q.  I want to make sure -- my learned co-counsel reminded me to

19 make sure that when I ask you about whether Mr. Williams is

20 living, I mean Mr. Louis Williams.

21 A.  I heard that he deceased.

22 Q.  Okay.

23      MS. ROSEBERRY:  I don't have anything else, Your

24 Honor.

25      THE COURT:  Any questions of this witness, Mr. Hyde?

1          MR. HYDE:  Yes, Your Honor, I do.

2                      CROSS-EXAMINATION

3  BY MR. HYDE:

4  Q.  Mr. Fluellen, you stated that you had the power put in your

5  name at these two residences because Mr. Louis Williams was

6  your friend?

7  A.  Yes.

8  Q.  Did he ask you to put the power in your name?

9  A.  Yes, he asked me.

10  Q.  And that was because -- and you agreed to do so because you

11  were his friend?

12  A.  Yes, sir.

13  Q.  Were you paying his bill there, or was he paying the bill?

14  A.  He was paying his own bill there.

15  Q.  Did he ever tell you why he wanted you to take the power

16  bill in your name?

17  A.  He just asked me as a friend.

18  Q.  But did he tell -- ask you -- did he ever tell you why you

19  wanted you to do it?

20  A.  No.

21  Q.  You just agreed to do it?

22  A.  Yeah.

23  Q.  Did you ever go into those houses?

24  A.  Yes, I been in them.

25  Q.  Did you see a bunch of dope in those houses?

1    A.   Yeah, I seen drugs.

2    Q.   Seen a lot of drugs?  Did you ever see any other people in

3    the house other than Mr. Louis Williams?

4    A.   I didn't see nobody but him.

5    Q.   Do you know of anyone else who had keys to the property

6    other than him?

7    A.   I don't know of nobody.

8    Q.   But he didn't live there.  He lived in Alabama.  Is that

9    correct?

10   A.   I don't know why -- he mostly -- I used to be up there on

11   29th Street.  He be up there, too.

12   Q.   But didn't you say a little while ago that Mr. Louis

13   Williams lived in Alabama?

14   A.   I say he from Alabama.

15   Q.   Okay.  Where did he live?

16   A.   I think he lived up there.

17   Q.   In these two properties that you mentioned beforehand?

18   A.   Yeah.

19   Q.   Okay.  So he was your friend, and you asked -- he asked you

20   to put the power bill in your name.  But you heard that he was

21   deceased.  You don't know that he's deceased?

22   A.   No.

23   Q.   You don't know that?  When's the last time you talked to

24   Mr. Williams?

25   A.   Been -- been a couple of years ago.

1  Q.  Are you still -- well, up until the time they destroyed

2  those houses, were you still receiving the power bill?

3  A.  No, the power bill was going to the houses.

4  Q.  Well, I mean, but they were in your name; correct?

5  A.  Yes.

6  Q.  So did the electric company come after you to pay the bills

7  after Mr. Williams allegedly deceased?

8  A.  They didn't come after me.

9  Q.  They didn't?

10  A.  They still got outstanding bills up there.

11  Q.  But you're not paying them?

12  A.  They in my name.  I don't have no money.

13  Q.  Was the property at either 1417 or 1419 29th Street, in

14  your opinion, fit to live in?

15  A.  I don't know.  He be up there and live up there, I think.

16  Q.  Well, I'm asking you for your opinion.  Were they -- were

17  those two properties fit to live in?

18  A.  Yes.

19  Q.  Were drugs sold out of those properties?

20  A.  I don't know.

21  Q.  You said you saw drugs in the properties.  Did you ever see

22  any sales take place inside those properties?

23  A.  I just go up there sometimes.  I didn't stick around up

24  there.

25  Q.  Well, how often did you go up there?

1  A.  Go up there and play ball, horseshoes, and stuff.

2  Q.  All right.  And during -- with Mr. Williams?

3  A.  Huh?

4  Q.  You played horseshoes with Mr. Williams?

5  A.  Yes, I played horseshoes with him.

6  Q.  Were other people there whenever you played horseshoes?

7  A.  Yes, some people were there.

8  Q.  Didn't you just tell the Court a minute ago you never saw

9  anybody else there other than Mr. Williams?

10  A.  I say I never seen nobody inside the houses but

11  Mr. Williams.

12          MR. HYDE:  Okay.  Thank you.

13          THE COURT:  Any redirect?

14          MS. ROSEBERRY:  Just a little bit, Your Honor.

15                  REDIRECT EXAMINATION

16  BY MS. ROSEBERRY:

17  Q.  Mr. Fluellen --

18  A.  Yes.

19  Q.  -- where would you pay horseshoes at the house?

20  A.  In the backyard.

21  Q.  Okay.  And what else was in the backyard of the house?

22  A.  A basketball goal.

23  Q.  Okay.  And when you were there playing horseshoes, would

24  you see people playing basketball back there, too?

25  A.  Yes.

1   Q.   Okay.   Is that kind of where people hung out?

2   A.   Yes.

3            MS. ROSEBERRY:  Nothing else, Your Honor.

4            THE COURT:  All right, sir.  You may step down.

5            Who do you have next, Ms. Roseberry?

6            MS. ROSEBERRY:  Your Honor, we have Edward Lamar

7   Hemmings.

8            THE COURT:  Edward Lamar Hemmings.

9            Stop right there a moment, sir, raise your right hand

10  and take the oath.

11       EDWARD LAMAR HEMMINGS, DEFENDANT'S WITNESS, SWORN

12            THE COURT:  Please be seated.  State your name for

13  the record, and spell that last name for the court reporter.

14            THE WITNESS:  My name is Edward Lamar Hemmings,

15  H-e-m-m-i-n-g-s.

16            THE COURT:  Ms. Roseberry?

17            MS. ROSEBERRY:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19  BY MS. ROSEBERRY:

20  Q.   Mr. Hemmings, where are you employed?

21  A.   Georgia Power Company.

22  Q.   And how are you employed by Georgia Power?

23  A.   I'm a revenue protection investigator.

24  Q.   Okay.   In your position as revenue protection investigator,

25  are you familiar with records that are kept by Georgia Power?

1   A.  Yes, ma'am, I am.

2   Q.  Are you familiar with customer service records that are

3   kept?

4   A.  Yes.

5   Q.  Did you bring some records here this morning in response to

6   a subpoena?

7   A.  I did.

8   Q.  Okay.  May I see those records, please?

9           MS. ROSEBERRY:  May I approach, Your Honor?

10          THE COURT:  Yes.

11  BY MS. ROSEBERRY:

12  Q.  Do you have them with you?

13  A.  You kept them.

14  Q.  I think I gave them back to you.

15  A.  Here's some of them.

16  Q.  Thank you, Mr. Hemmings.

17      I'm going to hand records back to you that have been marked

18  for identification purposes as Defendant's 1.  I'm going to ask

19  if you recognize Defendant's 1.

20  A.  Yes, ma'am.

21  Q.  And how do you recognize that?

22  A.  Yes, ma'am, I do.

23  Q.  How do you recognize that?

24  A.  It's on the customer record here with an account number.

25  Q.  Okay.  And you mentioned earlier that you're familiar with

1   records that are kept for customer service.  What are those

2   records?

3   A.  These are an accounting of the dates when the service was

4   activated and when the service was discontinued.

5   Q.  Does that appear to be the type of record that's kept by

6   Georgia Power?

7   A.  Yes, ma'am, it does.

8   Q.  And does it appear to be a record that's kept during the

9   normal course of business dealings with Georgia Power?

10  A.  Yes, it appears so.

11          MS. ROSEBERRY:  Your Honor, we tender Defendant's 1.

12          THE COURT:  Any objection?

13          MR. HYDE:  I'd like to see it, Your Honor.

14          THE COURT:  All right.  Let counsel see it.

15      (Document handed to counsel.)

16          MR. HYDE:  Thank you, Your Honor.  No objection.

17          THE COURT:  No objection?  D-1 is admitted.

18      (Defendant's Exhibit 1 was admitted into evidence.)

19          MS. ROSEBERRY:  Thank you, Your Honor.

20  BY MS. ROSEBERRY:

21      Mr. Hemmings, I'm going to hand you now what's been marked

22  for identification purposes as Defendant's 2 and ask you if you

23  recognize that.

24  A.  Yes, ma'am.

25  Q.  And how do you recognize that?

1  A.  This is a service activation with address and account

2  number here.

3  Q.  Okay.  And does that appear to be the same sort of record

4  as Defendant's 1, that's kept in the normal course of business

5  dealings with Georgia Power?

6  A.  Yes, ma'am.

7           MS. ROSEBERRY:  Okay.  We tender Defendant 2.

8           MR. HYDE:  No objection, Your Honor.

9           THE COURT:  It's admitted.

10      (Defendant's Exhibit 2 was admitted into evidence.)

11  BY MS. ROSEBERRY:

12  Q.  Okay.  Now, I'm going to ask you to refer to Defendant's

13  1.  Do you still have that up there?

14  A.  Yes, ma'am.

15  Q.  And can you tell me who the -- what the service address is?

16  A.  The service address is 1417 29th Street, Columbus, Georgia.

17  Q.  Okay.  And can you tell me who the service was requested

18  by?

19  A.  Service was requested by Charles Fluellen.

20  Q.  And what was the activation date?

21  A.  Service activation was 7/29 of '04.

22  Q.  Okay.  I'm going to refer you now to Defendant's 2 and ask

23  if you can tell me the service address.

24  A.  It's not on here.  The service is 1419 29th Street.

25  Q.  Okay, 1419.  And who was that service requested by?

1    A.  Charles Fluellen.

2    Q.  And what's the activation date of that service?

3    A.  I don't -- this one doesn't have an activation date that I

4    see.

5    Q.  Do you see a first active date for billing?

6    A.  I see where a payment was made on 5/30 of '06.

7    Q.  Okay.

8            MS. ROSEBERRY:  May I have a moment, Your Honor?

9        (A discussion was held off the record.)

10   BY MS. ROSEBERRY:

11   Q.  Can you tell me what the last -- on Defendant's 2, what the

12   last service bill date is on that record?

13   A.  It appears to be 11/27 of '06.

14   Q.  11/27/06?

15   A.  Yes, ma'am.

16   Q.  And I'm sorry to move around, but back to Defendant's 1.

17   A.  Yes, ma'am.

18   Q.  That is three pages, as opposed to one page of Defendant's

19   2.  Can you tell me what the last service date is on that

20   record?

21   A.  It appears to be 10/18/06.

22           MS. ROSEBERRY:  I don't have anything else, Your

23   Honor.

24           THE COURT:  All right.  Any questions of this

25   witness, Mr. Hyde?

```
 1             MR. HYDE:  No, Your Honor, no questions.
 2             THE COURT:  All right, sir.  You may step down.
 3  You're excused.
 4             MS. ROSEBERRY:  Where would you like me to tender
 5  these?
 6             THE COURT:  Give those to the clerk.
 7             MS. ROSEBERRY:  Thank you.
 8             Your Honor, we don't have any other witnesses.  We
 9  just have some argument.
10             THE COURT:  All right.
11             MS. ROSEBERRY:  Oh, I'm sorry, Your Honor.  We do
12  have another witness.
13             THE COURT:  All right.
14             MS. ROSEBERRY:  Pardon me.  We call Fred Rodriquez to
15  the stand.
16             THE COURT:  Fred Rodriquez.
17             Sir, if you'd raise your right hand and take the
18  oath.
19        ALFREDO V. RODRIQUEZ, DEFENDANT'S WITNESS, SWORN
20             THE COURT:  Please be seated.  State your name for
21  the record, and spell your last name for the court reporter.
22             THE WITNESS:  My name is Alfredo V. Rodriquez,
23  R-o-d-r-i-q-u-e-z.
24             THE COURT:  All right, Ms. Roseberry.
25                       DIRECT EXAMINATION
```

1   BY MS. ROSEBERRY:

2   Q.   Mr. Rodriquez, I apologize for using your nickname.

3   A.   All right.

4   Q.   How are you employed?

5   A.   I'm employed as the -- one of the staff investigators for

6   the Federal Public Defenders' office out of Macon, Georgia.

7   Q.   Okay.  And as a part of your work, did you conduct an

8   investigation in the Curtis Williams case into someone named

9   Louis Williams?

10  A.   Yes, ma'am, I did.

11  Q.   Okay.  And what did your investigation reveal about Louis

12  Williams?

13  A.   A couple of things so far was that a search of newspaper

14  articles revealed that a Louis Williams was involved in a fatal

15  one-vehicle accident on the -- at the corner of Second Avenue

16  and Talbotton Road in Columbus, Georgia.

17  Q.   Okay.  Did you ever discover where Mr. Williams was from

18  originally?

19  A.   He was from the Phenix City area, Alabama.

20  Q.   Did you discover the date of the fatal accident?

21  A.   The date of the fatal accident was the 30th of December of

22  '06.

23          MS. ROSEBERRY:  May I have a moment, Your Honor?

24      (A discussion was held off the record.)

25  BY MS. ROSEBERRY:

1  Q.  Mr. Rodriquez, are you sure about that date of the

2  accident?

3  A.  No, I'm not.

4  Q.  Is there anything that would refresh your memory?

5  A.  Yes.  The -- I have a police report, and the date on that

6  is 12/30/07.

7          MS. ROSEBERRY:  Okay.  Thank you.  Nothing further.

8          THE COURT:  So it would be your testimony, based on

9  your investigation, that Mr. Louis Williams died in an

10  automobile accident on December 30th of 2007.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  All right.  Mr. Hyde, any questions?

13                    CROSS-EXAMINATION

14  BY MR. HYDE:

15  Q.  Mr. Rodriquez, what did you do to confirm that this is the

16  same Louis Williams as was the person named in the newspaper

17  article that was somehow connected to the homes on 29th Street?

18  A.  At this time we have requested a death certificate of the

19  individual in question.  We have not received that yet.  And

20  other than the newspaper article and the police report,

21  identifying data that was listed on there, that's all that we

22  have at this point in time in our investigation, which is not

23  concluded.

24  Q.  So then the answer is, nothing has been done to confirm

25  that the same Louis Williams who allegedly died in this

1   accident had some connection to the 29th Street homes; is that

2   correct?

3   A.   That is correct.

4   Q.   And you would not -- would you not agree that Louis

5   Williams is a fairly common name?

6   A.   From the information that we have, you know, we're -- the

7   information that we have, has taken those two, that it's --

8   individual Louis Williams is the same one that was related to

9   the 1417 and 1419 29th Street.

10  Q.   Well, now, if the power was not in Mr. Williams' name, if

11  it was in Mr. Fluellen's name, what evidence whatsoever do you

12  have to even connect Louis Williams to the homes on 29th

13  Street?

14  A.   The direct information that I have is from our client.

15  Q.   From your client --

16  A.   That's correct.

17  Q.   -- the defendant, the one who's on trial?

18  A.   That's correct.

19  Q.   All right.   Now, you were in the courtroom when Mr. Charles

20  Fluellen testified.   Is that correct?

21  A.   That is correct.

22  Q.   And he testified that he had seen drugs in these particular

23  homes on various occasions.   Did you hear him testify to that?

24  A.   Yes, sir.

25  Q.   Is it your opinion that if this Louis Williams was alive,

1   he would come in and admit to having all those drugs in that

2   house?

3           MS. ROSEBERRY:  Your Honor, I'm going to object.

4   First, it's outside the scope of the direct.  And it's also

5   asking this witness to speculate about what someone else would

6   come in and testify about.

7           MR. HYDE:  Which is precisely my point, Your Honor.

8           THE COURT:  Overruled.

9   BY MR. HYDE:

10  Q.  That would, in fact, be speculation on the part of the

11  defense to suggest that anyone having any particular

12  proprietary interest in these two homes was going to come in

13  and admit having all those drugs.  Wouldn't that be true?

14          MS. ROSEBERRY:  Objection.  That's a different

15  question, Your Honor, and I'm going to object to that question

16  on the same grounds.

17          THE COURT:  Well, I mean, the bottom line is, sir,

18  you have -- do you have any idea whether Louis Williams had

19  drugs in those homes on 29th Street that he would accept

20  responsibility for?

21          THE WITNESS:  At this point in time, no, sir, I do

22  not.

23  BY MR. HYDE:

24  Q.  And leads to my final question.  So no one, as far as

25  you're concerned -- or as far as you know -- with the Federal

1    Defenders' Office had any conversation with Mr. Williams prior

2    to his demise wherein he stated he was going to come in and

3    accept responsibility for these drugs.  Is that correct?

4    A.  That is correct.

5              MR. HYDE:  Thank you.

6              MS. ROSEBERRY:  Redirect, Your Honor.

7              THE COURT:  Ms. Roseberry?

8                    REDIRECT EXAMINATION

9    BY MS. ROSEBERRY:

10   Q.  As a part of your investigation, Mr. Rodriquez, did you

11   have an opportunity to canvass the neighborhood?

12   A.  Yes, we did.

13   Q.  And what did you learn in your investigation from

14   canvassing the neighborhood?

15   A.  The common knowledge for that point in time from

16   individuals that we were able to talk to was that Mr. Louis,

17   Louis Williams, was a regular in that area; also that everyone

18   knew, general knowledge, that he sold drugs out of either 1417

19   or 1419 29th Street.

20   Q.  Okay.  And did you have an opportunity to observe the

21   places where 1417 and 1419 29th Street are?

22   A.  Yes, ma'am, I did.

23   Q.  Okay.  And what were your observations?

24   A.  The -- both -- the two -- those two -- the buildings for

25   those two addresses, the houses were torn down sometime in late

1   '07 or early '08.

2   Q.  Okay.  Now, you mentioned that in canvassing the

3   neighborhood you got information that Mr. Williams was

4   associated with those houses --

5   A.  That is correct.

6   Q.  -- and that he dealt drugs out of those houses?

7   A.  That is correct.

8   Q.  Was anybody willing to come forward in court to say that

9   for you?

10  A.  No, ma'am, they were not.

11  Q.  Okay.  And did you have some understanding of why?

12  A.  Yes.

13  Q.  And what was that understanding?

14  A.  Just the normal understanding that it's not the -- in that

15  part of town and just by the way that they operate, you know,

16  it's not -- you know, they -- it's not normal business to rat

17  on individuals or -- that are doing that kind of stuff.  It's

18  frowned upon.  Word would get out, and then they would be in

19  trouble.

20          MS. ROSEBERRY:  Okay.  I don't have anything further.

21          THE COURT:  Mr. Rodriquez, let me ask you a couple of

22  questions just to clarify your testimony.

23          That sentiment that existed, not to rat on people in

24  the neighborhood because of concern that would be associated

25  with ratting on someone, is it your understanding based on

1    talking with those people and your experience as an

2    investigator that they would've had those same reservations

3    back before Mr. Louis Williams died on December the 30th of

4    2007?  Is there anything that indicates to you that that

5    sentiment changed after his death, as compared to before his

6    death, or that just seemed to be pervasive in that

7    neighborhood?

8              THE WITNESS:  I think that it would be pervasive in

9    that neighborhood.

10             THE COURT:  And if Mr. Louis Williams had not died,

11   is there anything about his having drugs allegedly in those

12   houses that you think would be different today if he were still

13   alive?

14             In other words, if he weren't willing to confess to

15   having the drugs because he's concerned about his own legal

16   liability, and if the neighborhood people aren't willing to rat

17   on anybody today, just like they wouldn't back then --

18             THE WITNESS:  Yes, sir.

19             THE COURT:  -- can you think of anything that would

20   be different as far as Louis Williams being pinned with those

21   drugs?

22             THE WITNESS:  No, sir, other than the fact that just

23   to try to play on doing the right thing and not letting

24   somebody else from the neighborhood, from the hood, you know,

25   take the blame for what he's going to do.  It would be a long

1    shot, but that's what we would be trying to do.

2              THE COURT:  Right.  I guess I'm trying to find out,

3    for example, how would Mr. Curtis Williams -- in your view, how

4    has he been prejudiced by the death of Louis Williams -- if, in

5    fact, Louis Williams died -- how has he been prejudiced by

6    that?  If Louis Williams wouldn't come in and confess to it

7    all, and if the people in the neighborhood would not rat on

8    Louis Williams regardless of whether he were dead or not, how

9    has Curtis Williams been prejudiced by his death, based on your

10   experience in your investigation?

11             THE WITNESS:  The information that we have discovered

12   was that there was a reason for Mr. Curtis Williams to be at

13   that location, which was going to be to drop off the keys to

14   Mr. Louis Williams.  They had been together earlier during the

15   day.  Mr. Louis Williams had left his set of keys in the

16   vehicle that Mr. Curtis Williams was driving.  They were in his

17   vehicle.

18             THE COURT:  And your investigation, I take it from

19   your client --

20             THE WITNESS:  That is correct.

21             THE COURT:  -- shows that he claims that he left the

22   keys there, and --

23             THE WITNESS:  Yes, sir.

24             THE COURT:  -- there's a possibility that Louis

25   Williams may could testify possibly that, yes, he left the keys

1  there?

2          THE WITNESS:  That's correct.

3          THE COURT:  Is there anything else that you think

4  prejudices your client based upon the death of Louis Williams,

5  other than the possibility that he may would have confirmed

6  testimony that may or may not be given that Curtis Williams

7  dropped some keys off?

8          THE WITNESS:  We have three other individuals that

9  were within range of knowing that they were going to go see

10  Louis Williams for the specific reason of dropping those keys

11  off to them.

12          THE COURT:  And those persons still are alive?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  And if this case went to trial, they

15  would still be available to confirm that testimony?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Okay.  Mr. Hyde, do you have any --

18          MR. HYDE:  Yes, I do.

19          MS. ROSEBERRY:  May I have some additional direct

20  based on your questions?

21          THE COURT:  You can -- I sort of interrupted

22  Mr. Hyde's cross.  So I'm going to let him finish his cross,

23  and then you can do your redirect.

24                          RECROSS-EXAMINATION

25  BY MR. HYDE:

1   Q.  Mr. Rodriquez, are you familiar with documents filed by the

2   defense in this case for the purpose of these motion hearings?

3   A.  I'm familiar of the documents that were filed.  Not

4   specifically I'm not familiar with them.  No, I'm not.

5   Q.  Well, I'm referring specifically to Document No. 61, motion

6   to dismiss for pre-indictment delay.  Have you read that

7   document?

8   A.  I have not.

9   Q.  Well, would you be surprised to hear that in the document,

10  under the statement of facts -- and I quote from page 2, and

11  this is the defendant's version of what happened when those

12  keys were dropped off:  "When the defendant went to the 29th

13  Street address to return Louis's keys, he found no one there."

14      Were you aware that that was what the defendant contended?

15  A.  Yes, I'm -- yes, I'm aware of that.

16  Q.  So, then, what you previously said to the Court, that

17  Mr. Louis would have been available to say that "He dropped off

18  the keys to me," that's not entirely correct, is it?

19  A.  I'm thinking that that comment was that no one there was --

20  Mr. Louis Williams was not there.

21  Q.  Well, according to the defendant's version of things, there

22  was nobody there, period.

23  A.  There was no one at the house --

24  Q.  All right.

25  A.  -- those houses.

1  Q.  So there was nobody there who could verify Mr. Curtis
2  Williams's statement --
3          THE COURT:  Let's focus in on Louis Williams.  I
4  mean, is your memory now refreshed that if Louis Williams had
5  not died, he still would not be able to come in and confirm
6  that the defendant dropped off the keys, because, apparently,
7  according to the attorneys for the defendant, he wasn't there?
8          Maybe that's a little confusing.
9          You testified earlier that -- I was asking you about
10  prejudice to the defendant based upon Louis Williams's death,
11  and one thing you mentioned was that your investigation had
12  found that Curtis Williams had dropped off some keys with Louis
13  Williams.  And Louis Williams, if he's not -- if he's dead, he
14  can't come in and confirm that Curtis dropped off keys with
15  him.
16          But Mr. Hyde, according to the filings of Curtis
17  Williams's lawyers, says that when Curtis Williams went by to
18  drop off the keys Louis Williams was not there.  So if that's
19  the case, then even if Louis Williams were still alive, he
20  couldn't come in and testify that Curtis left the keys with
21  him, could he?
22          THE WITNESS:  That's correct.  We would've had -- we
23  would've had the information that he had called Mr. Curtis
24  Williams to ask him to go by and meet him to drop off the
25  keys.  When Mr. Curtis Williams received that call, he was with

```
 1   three other individuals.  And they were told, "I'm going over
 2   to Louis's to drop off the keys," and then they decided to go
 3   with him.
 4              THE COURT:  So if Louis was still alive, he may could
 5   testify that he called Curtis about the dropping off of the
 6   keys.
 7              THE WITNESS:  Yes, sir.
 8              THE COURT:  But even with Louis not alive, you've got
 9   other witnesses if we went to trial who could say they were
10   present at the time and that they understood that Louis
11   Williams had called about dropping off the keys and they were
12   with Curtis when Curtis left to drop the keys off.
13              THE WITNESS:  That is correct.
14              THE COURT:  There is evidence that you can present on
15   that, even though Louis is not still with us.
16              THE WITNESS:  That's correct.
17              THE COURT:  Okay.  Mr. Hyde?
18              MR. HYDE:  Nothing else, Your Honor.  Thank you.
19              THE COURT:  Ms. Roseberry?
20              MS. ROSEBERRY:  Yes, Your Honor.
21                     FURTHER REDIRECT EXAMINATION
22   BY MS. ROSEBERRY:
23   Q.  Mr. Rodriquez, have you been able to speak with Louis
24   Williams?
25   A.  Louis Williams?  No, I have not.
```

1  Q.  Have you been able to ask Mr. Williams if he would admit to

2  possessing drugs?

3  A.  Have not.

4  Q.  Have you been able to ask Mr. Williams if he called

5  Mr. Curtis Williams about keys?

6  A.  Have not.

7  Q.  Have you been able to ask Mr. Williams if he was associated

8  in any way with 1417 and 1419 29th Street?

9  A.  No, ma'am.

10  Q.  Have you had -- been able to ask Mr. Williams anything

11  about this case?

12  A.  No, ma'am, have not.

13  Q.  And why is that?

14  A.  He's deceased to the best of my knowledge.

15  Q.  The Louis Williams that your investigation revealed died,

16  is that the Louis Williams that you found was connected to 1417

17  and 1419 29th Street?

18  A.  That is correct.

19  Q.  The three people that you mentioned, who you thought might

20  have information about the conversation, did you ever find out

21  whether they were in those conversations or heard the

22  conversations?

23  A.  They overheard conversation or were told about the

24  conversation and were going with Mr. Curtis Louis (sic) to drop

25  off the keys and then they were going to another location.

1    Q.   Okay.  And when you found out about these individuals, did

2    you address whether their memories are better now or worse now?

3    A.   They're worse now.

4              MS. ROSEBERRY:  May I have a moment?

5         (A discussion was held off the record.)

6              MS. ROSEBERRY:  That's all.

7              MR. HYDE:  All right.  One more thing, sir.

8                        FURTHER RECROSS-EXAMINATION

9    BY MR. HYDE:

10   Q.   A little while ago I asked you what do you have to connect

11   Mr. Louis Williams to the homes on -- what was it -- 29th

12   Street.  And you said you were working on it.  And just now

13   Ms. Roseberry said, "Is this the same Louis Williams that you

14   connected to the homes on 29th Street?"

15       Again, how do you connect Louis Williams to the homes on

16   29th Street when the power was in Mr. Fluellen's name?  How do

17   you do that?

18             MS. ROSEBERRY:  I'm going to object to this question,

19   asked and answered.  He testified --

20             MR. HYDE:  No, it hasn't been asked -- it has not

21   been answered apparently.

22             THE COURT:  Well, let's talk one at a time.

23             I'm a little confused as to whether it's been asked

24   or answered.  He can answer it now.

25             What's the best evidence you've got that the two were

1    one and the same?

2              THE WITNESS:  The best evidence we have at this point

3    in time is from Mr. Curtis Williams and the other three

4    individuals that we have -- that were with Mr. Curtis Williams

5    and the general information from those that were unwilling

6    to --

7              THE COURT:  Well, I understand you've got that

8    evidence that ties into the homes on 29th Street.  What

9    evidence -- what's your best evidence that that Mr. Williams is

10   the one that died in the car wreck, other than just the same

11   name?

12             THE WITNESS:  Don't have any documentation that he

13   was tied to those houses at this time.

14             THE COURT:  Does the information on the accident

15   report indicate an age, a race, a description that makes him

16   similar to the Louis Williams that owned the homes on 29th

17   Street, or not?

18             THE WITNESS:  Yes, sir, it does.

19             THE COURT:  So you made that comparison.

20             THE WITNESS:  Yes, sir.

21             MS. ROSEBERRY:  Your Honor, may I just follow up?

22             THE COURT:  Yes, ma'am.

23                      FURTHER REDIRECT EXAMINATION

24   BY MS. ROSEBERRY:

25   Q.  When you canvassed the neighborhood and found -- got

1  information from people in the neighborhood that there was a
2  Louis Williams connected to that house, did you get information
3  from canvassing the neighborhood that those folks were aware
4  that that same Louis Williams was now deceased?
5  A.  That's correct.
6          THE COURT:  Are you the one that -- has there been
7  evidence as to when the houses were torn down?  Is this the
8  witness to do that?
9          MS. ROSEBERRY:  Your Honor, we're still trying to get
10  those records.  We know that it's not standing now.  The
11  records have not come in yet, so we didn't put that testimony
12  on.  I mean, he can talk about in his investigation generally
13  when the house -- when he found out the house no longer had --
14          THE COURT:  I just need to know what you're relying
15  on in your motion to dismiss.  Today is the day for the
16  evidentiary hearing.  Do you have any evidence as to when the
17  houses were torn down, or are you abandoning that argument?
18          MS. ROSEBERRY:  We are not abandoning it, Your
19  Honor.  We're standing on the principle that today we can't
20  investigate those houses because today they're not standing.
21  We can't go back --
22          THE COURT:  What I need to know is whether you've got
23  any evidence you want to present today as to the date that they
24  were torn down.
25          MS. ROSEBERRY:  I'll ask Mr. Rodriquez, Your Honor.

1          THE COURT:  Okay.

2    BY MS. ROSEBERRY:

3    Q.  Mr. Rodriquez, in your investigation did you come to

4    understand a general date when the houses were torn down?

5    A.   The general date that we have is October the 20th, 2007.

6    And that was the date that they were sold to a Mr. Peter -- and

7    I'll spell the last name -- B-r-o-u-c-h-u.  And they were sold

8    to that individual by a William Jordan from Columbus, who owned

9    the property and then sold it to Peter BRO-shay or BRO-shu on

10   the 20th of October of '07, and --

11          THE COURT:  Is it clear to you that the houses were

12   not standing at any time during 2009?

13          THE WITNESS:  That is correct.  Information that

14   Mr. Jordan relayed to us was that after the sale on the 20th of

15   October the houses were torn down shortly thereafter, within

16   two or three weeks.

17          THE COURT:  Okay.  Of October 20th of 2007.

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Okay.  All right.

20          MS. ROSEBERRY:  Nothing further, Your Honor.

21          THE COURT:  All right, sir.  You may step down.

22          MS. ROSEBERRY:  We don't have anything other than

23   argument, Your Honor.

24          THE COURT:  All right.  Mr. Hyde, does the government

25   want to put up any evidence?

1           MR. HYDE:  No, Your Honor.

2           THE COURT:  Okay.  Who's going to make the argument

3    for the government?  Mr. Fakhimi -- I mean for the defendant.

4    I'm sorry.

5           MR. FAKHIMI:  Yes, Your Honor.

6           THE COURT:  Let's focus on the Speedy Trial Act

7    first.  And tell me -- this case was indicted when?

8           MR. FAKHIMI:  The indictment was filed September 30th

9    of 2008, Your Honor.

10          THE COURT:  September 30th of 2008 --

11          MS. ROSEBERRY:  Excuse me, Your Honor.  I don't

12   mean --

13          THE COURT:  -- or '9?

14          MS. ROSEBERRY:  -- to interrupt.  Can we let our

15   witnesses go?  Mr. Hemmings is working with Georgia Power.

16          THE COURT:  Yes.  Any of the witnesses, they --

17   you're excused.

18          The indictment was first issued September 30th of

19   2008?

20          MR. FAKHIMI:  Yes, sir.

21          THE COURT:  And it's your contention that the Speedy

22   Trial Act deadline ended when?

23          MR. FAKHIMI:  Well, the clock didn't start ticking

24   until a year later, Judge.  His initial appearance was almost a

25   year to the date from the filing of the indictment, for some

1    reason.  So the Speedy Trial Act says that whichever is the
2    latest of those two events shall begin the ticking of the
3    70-day clock.  The parties agree that the clock started to tick
4    at the initial appearance a year after the indictment was
5    filed.  So the clock started ticking September 28th of '09,
6    which would have resulted in a 70-day -- or expiration of the
7    70-day term as of December 7th of '09, where 18 U.S.C.
8    3162(a)(2) says --

9           THE COURT:  All right.  Tell me what happened after
10   September the 30th of 2008 that prejudiced your client's
11   rights.  In other words, as I understand it, the two things in
12   your papers that you argue resulted in prejudice to your
13   client, other than delay -- and I'll get to that in a moment --
14   but the two specific things you point to are the death of
15   Mr. Louis Williams, which the government -- I mean the
16   defendant contends occurred on December the 30th of 2007, and
17   the tearing down of the houses, which the defendant contends
18   happened on October the 20th of 2007.  The indictment did not
19   come down until September 30th of 2008.

20           So if they had tried him within 70 days of that date,
21   within 70 days of September 30th of 2008, within the Speedy
22   Trial Act time, you still would not have had the ability to
23   bring Mr. Louis Williams as a witness because he had already
24   died even before that time, and you still would not be able to
25   have available to you any evidence regarding the two houses on

1    29th Street because they were torn down before that time.  So

2    if that's the case, tell me what the prejudice is under the

3    Speedy Trial Act.

4           MR. FAKHIMI:  Yes, Your Honor.  I'll address the

5    question two ways.

6           If that were the case -- if the case had been pushed

7    to trial within the 70 days immediately following the

8    indictment -- obviously there would have been no motion to

9    dismiss for violation of the Speedy Trial Act, and so we

10   wouldn't have shown prejudice under it.  We would have still --

11          THE COURT:  How is he different today?  If we tried

12   the -- if we tried the case in March --

13          MR. FAKHIMI:  Right.

14          THE COURT:  -- of 2010, which we were planning on

15   doing, then with regard to the lack of presence of Louis

16   Williams and with regard to the lack of any evidence regarding

17   the houses, how would it be different in March of 2010 with

18   regard to those two things than it would have been back in

19   October of 2008, just with regard to those two specific items?

20   It would be the same, wouldn't it?

21          MR. FAKHIMI:  With regards to the fact that Mr. Louis

22   Williams would continue to be unavailable, just as he was in

23   '08, and the fact that the crime scenes most probably did not

24   exist in '08 as well as '07, other than the fact that other

25   witnesses' memories and whatnot would have faded, with regards

1    to those two points he would be in the same position.

2              THE COURT:  All right.  So other than the possibility

3    that memories have faded in general of other witnesses -- which

4    there's been no evidence of that -- what prejudice has he

5    suffered by the delay?

6              MR. FAKHIMI:  Under the Speedy Trial Act, you mean,

7    Your Honor?

8              THE COURT:  Yes, sir.

9              MR. FAKHIMI:  Yes.  You know, Judge, the Speedy Trial

10   Act, as far as analyzing whether or not a dismissal should be

11   with or without prejudice and thus their own internal prejudice

12   inquiry as to how a person has been harmed, it focuses on the

13   facts and circumstances of the case leading up to dismissal.

14   My understanding of that, Judge, is that it's not limited to

15   prejudice that occurs within those 70 days itself.  The 70

16   days --

17             THE COURT:  I'm asking you what is the -- I mean,

18   your evidence -- you apparently felt the evidence that was

19   significant to show harm to him was the death and the loss of

20   the houses.  That's what you focus on in your briefing, and

21   that's what you've presented today.  So what is the harm to

22   him, other than just the fact that there may or may not be some

23   presumption of harm if he's not tried within the 70 days?  What

24   harm has there been to him?

25             MR. FAKHIMI:  Judge, he's effectively handicapped in

1    defending this case.  Now, this --

2              THE COURT:  Tell me how.

3              MR. FAKHIMI:  Will do --

4              THE COURT:  It has nothing to do with him not having

5    Mr. Williams here because he wouldn't have been here anyway.

6    It has nothing to do with the houses not being here because

7    they wouldn't have been here anyway.  So rather than just

8    telling me conclusively that he's been harmed, tell me

9    specifically how he's been harmed.  How is he not getting a

10   fair trial in March that he would have gotten back in October

11   of '08?

12             MR. FAKHIMI:  With regards only to Speedy Trial Act?

13             THE COURT:  No, with regard to anything.

14             MR. FAKHIMI:  Oh, with regards to anything.

15             THE COURT:  No, no -- yeah, with regard to the Speedy

16   Trial Act, yes.

17             MR. FAKHIMI:  Only the Speedy Trial Act.

18             THE COURT:  Right.

19             MR. FAKHIMI:  Okay.  Judge, the neighborhood has

20   changed.  People in the neighborhood surely move around as

21   these two years --

22             THE COURT:  I haven't heard any evidence of that.  I

23   want you to -- I've given you a chance to put up an evidentiary

24   basis for your motion.  Does the law say that the Court can

25   take judicial notice that the neighborhood on 29th Street is

 1   transient?

 2            MR. FAKHIMI:  No, Judge, that's not really what I'm

 3   getting at.  I suppose --

 4            THE COURT:  Well, tell me how he's been harmed.  Why

 5   can he not get a fair trial now that he could have gotten back

 6   in October of '08?

 7            MR. FAKHIMI:  I would say that it's for the same

 8   reason, Judge, that he shouldn't have been tried in October

 9   either.  It's unfair to try him in October of '08, just as it

10   is to try him now, because Mr. Williams, in addition to being a

11   potential witness, was also an important investigative lead for

12   the --

13            THE COURT:  Well, he could have been tried in October

14   of '08 consistent with the Speedy Trial Act, couldn't he?

15            MR. FAKHIMI:  He could have, but we would maintain

16   that --

17            THE COURT:  All right.  Well, we're focused on the

18   Speedy Trial Act right now.  I'll let you get to your

19   Constitutional arguments in a moment, but let's focus on the

20   Speedy Trial Act.

21            As far as the Speedy Trial Act is concerned, how is

22   it different now than it would have been back in '08?

23            MR. FAKHIMI:  That much additional fading of the

24   memory of witnesses, Judge.  I would just say an additional two

25   years of faded memories.

1          THE COURT:  Are you aware of any case law that says
2     that alone is sufficient to dismiss with prejudice under the
3     Speedy Trial Act, general fading of memory?
4          MR. FAKHIMI:  No, Judge, but I'm -- I'm not certain
5     that the Court need only focus as far as its inquiry of
6     dismissal with prejudice under the Speedy Trial Act.  I'm not
7     sure that our inquiry must only be focused as to events
8     happening after the date of indictment.  Events happening prior
9     to the date of indictment can be accounted for in your calculus
10    as to whether or not to dismiss with prejudice under the Speedy
11    Trial Act as well.
12         THE COURT:  Do you have legal authority for that?
13         MR. FAKHIMI:  I don't, but I'd be happy to supplement
14    with briefing after today, if Your Honor would like.
15         THE COURT:  And your argument with regard to
16    dismissal pursuant to the Sixth Amendment is that -- and your
17    motion for dismissal based on pre-indictment delay is that if
18    he had been indicted earlier, he could've had the opportunity
19    to have Louis Williams present as a witness?
20         MR. FAKHIMI:  In addition, Judge --
21         THE COURT:  Is that your contention?
22         MR. FAKHIMI:  That is correct.
23         THE COURT:  What evidence is there that a person
24    would confess a crime in order to help someone else avoid
25    criminal responsibility?

1            MR. FAKHIMI:  Well, Your Honor, we're --

2            THE COURT:  Isn't the general presumption that he'd

3    be presumed to be innocent, and wouldn't the general

4    presumption be that he would not likely say anything that would

5    incriminate himself?

6            MR. FAKHIMI:  I agree with Your Honor.

7            THE COURT:  So what evidence do you have that he

8    would have -- this particular Louis Williams would have done

9    anything other than not incriminate himself --

10            MR. FAKHIMI:  Your Honor --

11            THE COURT:  -- other than speculate?

12            MR. FAKHIMI:  Sure.  Even though the possibility

13    exists that he would've come, correct, and said, "I am the true

14    culprit here," Your Honor is correct that the probability would

15    be otherwise.

16            THE COURT:  All right.

17            MR. FAKHIMI:  However, in addition to that, Judge,

18    Mr. Williams presented an investigative lead that has now

19    vanished.  We could have perhaps assigned blame to him for

20    these houses and for the operation of houses through other

21    investigative means.  Had he continued to do this work, he

22    would have left a trail behind him.  We could have perhaps

23    picked up on it.

24            The fact that he ceased to exist as of December 30,

25    2007, and the three years almost -- two and a half years that

1    have passed since then have resulted in all those trails, those

2    investigative trails, drying up and vanishing.

3              THE COURT:  So it's your view that the only way for

4    your client's Constitutional rights to have been protected

5    would have been if they had indicted him before December 30th

6    of 2007, which is the date of death of Louis Williams?  And if

7    so, what's the magic of that date?  Why not January 15th of

8    2008?  I mean, how can you say it's a Constitutional violation

9    for him not to have been indicted prior to December 30th of

10   2007 but -- why that magic date?  Other than it's the date that

11   Mr. Louis Williams apparently died.

12             MR. FAKHIMI:  That's the key focus, Judge.  We say

13   that because an important --

14             THE COURT:  So if he'd been indicted on January the

15   2nd of 2008, you think you'd have the same argument.

16             MR. FAKHIMI:  Judge, if he would have been indicted

17   the day after Mr. Williams's death, I would have in all

18   likelihood brought the same argument.

19             THE COURT:  When was he actually arrested?

20             MR. FAKHIMI:  He was arrested on the evening of July

21   14, 2006, when these events took place, Judge.  And he lingered

22   for a year and a half before Louis's death, two years and two

23   months before the indictment was filed, approximately three

24   years before the crime scene was destroyed.

25             THE COURT:  When was he first appointed counsel?

1          MR. FAKHIMI:  Three years, two months, and 15 days

2     after the July '06 arrest, Judge, at his initial appearance.

3          Now, when he was appointed counsel, at that point the

4     crime scene no longer existed.  Mr. Williams had been dead for

5     quite some time.

6          THE COURT:  All right.  Go ahead.  I think I

7     understand your argument.  Your argument with -- without regard

8     to the Speedy Trial Act -- with regard to the other two is that

9     if he had been indicted earlier --

10         MR. FAKHIMI:  Yes, Judge.

11         THE COURT:  -- you would've had an opportunity to try

12    to trace leads through Louis Williams and through the houses

13    when they were physically there.

14         MR. FAKHIMI:  Yes, Your Honor.

15         In addition to tracing leads, Judge, our ability to

16    subject the government's case to meaningful adversarial testing

17    would have very, very desperately required us to examine the

18    physical location of these two houses.  It was the government's

19    position that a set of keys were pulled out of Mr. Williams's

20    pocket, with which they opened the doors of these two houses.

21    We're unable to test these keys if they're still in the

22    government's possession --

23         THE COURT:  What's the statute of limitations on the

24    offense that he's being charged with?

25         MR. FAKHIMI:  I believe it's five years, Judge.  In

1   addition --

2           THE COURT:  And what is the legal standard for a

3   dismissal with prejudice if the action is brought within the

4   statute of limitations?

5           MR. FAKHIMI:  Under pre-indictment delay, Judge, in

6   addition to prejudice and harm to the defendant, the Court must

7   find that the delay occasioned by the government was, A, the

8   product of a deliberate act; and B, designed to gain a tactical

9   advantage.

10          THE COURT:  And what evidence do you have of that?

11          MR. FAKHIMI:  We do not know what was in the mind of

12  the attorneys and agents of the government in occasioning the

13  delay, so we do not know whether they designed to gain a

14  tactical advantage.  However, we say that it was not through

15  accidents that the delay happened.  The delay was the product

16  of affirmative action by the government.  And the consequence

17  was a huge tactical advantage for the government and us being

18  effectively handicapped from putting on a vigorous defense and

19  subjecting their case to any meaningful --

20          THE COURT:  Well, you speak in terms of a huge

21  tactical advantage as if that's a fact.  The huge tactical

22  advantage is what, that Louis Williams would have come in and

23  said, "It's all mine.  Curtis had nothing to do with it"?

24          MR. FAKHIMI:  No.  With regards to the tactical

25  advantage, Judge, I'd more point to the fact that the crime

1    scene doesn't exist.  We cannot inspect the premises.  We

2    cannot subject the word of the arresting officers to any

3    testing, based on vantage point, lighting, the keys, the lock

4    itself, the location of the houses, bushes, trees, time lines,

5    and whatnot.  We can't do any of that.

6            And if the Court were to dismiss, say, for example,

7    under the Speedy Trial Act without prejudice, the government

8    reindicts the case, and we come on for trial this September,

9    we're in the same boat.  In fact, possibly worse.  It's an

10   additional four months of delay.

11           THE COURT:  Well, what if you had a fire in a home

12   that happened two days after the arrest?

13           MR. FAKHIMI:  Two days after the arrest would not be

14   able to be laid at the government's doorstep on grounds of

15   delay and unreasonable and unnecessary delay.  The government's

16   response to our motions hasn't come and said that, well, we

17   delayed because of additional investigation, or we delayed

18   because it was out of our hands.  The government's been silent

19   as far as the cause of the delay.  This Court's unable to

20   determine whether it was necessary or not.  We maintain it was

21   unnecessary.  They haven't really responded to that.  But if

22   there was a fire and an accident two days after an arrest, then

23   as bad as that is, it's not really able to be blamed on the

24   government.

25           THE COURT:  Would it make any difference legally if

1  they had not arrested him on July the 14th of '06 but they had

2  arrested him two days before he was brought in for his initial

3  appearance?  Would that make a difference?

4           MR. FAKHIMI:  With regards to the motion to dismiss

5  for pre-indictment delay?

6           THE COURT:  Yes.

7           MR. FAKHIMI:  If they had arrested --

8           THE COURT:  Is there a -- does it matter legally if

9  they had indicted him within a week of his arrest, but his

10  arrest had been delayed for a year or two --

11           MR. FAKHIMI:  I would argue that for the purpose --

12           THE COURT:  -- as long as it's within the statute of

13  limitations?  Is there a legal difference?

14           MR. FAKHIMI:  No, Judge there isn't, because the --

15           THE COURT:  So what does the statute of limitations

16  mean?

17           MR. FAKHIMI:  The statute of limitations is the upper

18  end by which Congress will allow the government to push any

19  case forward.  The due process clause can -- and Rule 48(a), I

20  believe, of the Criminal Procedure Rules -- allow the

21  government and the Court to dismiss a case for excessive delay

22  not reaching the statute of limitations due to prejudice

23  against the defendant.

24           THE COURT:  Mr. Hyde, what's the government's

25  response?  You apparently don't want to put up any evidence as

1    to what the -- why we had the delay?

2              MR. HYDE:  I certainly can, Your Honor.

3              THE COURT:  What is the government's position on

4    that?

5              MR. HYDE:  Well, the government's position is that

6    Mr. Williams was originally arrested by the state.  It was

7    later presented -- the case was later presented to the federal

8    government as suitable for federal prosecution.  During the

9    intervening time of it being presented to the government and

10   the actual indictment, the government attempted -- well, let me

11   back up.

12             In addition to drugs, there --

13             THE COURT:  Do you have personal knowledge of all

14   this, yourself?

15             MR. HYDE:  Yes, sir, I do, because I was part of the

16   chain.

17             THE COURT:  All right.  I think it's important to

18   have on the record the reason for the delay in order for the

19   Court to evaluate whether this was done for some tactical

20   advantage or was done in the ordinary course of investigating a

21   crime.  So go ahead -- I don't think you need to take the

22   witness stand, but state in your place the basis for the delay.

23             MR. HYDE:  Your Honor, as has already been pointed

24   out, the particular crime, or the alleged crime, was committed

25   on July 14, 2006.

1                Now, at that time there was a search warrant that was

2    served at the two residences that have been discussed earlier

3    during this hearing.  In addition to narcotics, there were also

4    firearms recovered during the course of that particular search.

5                THE COURT:  It was a state investigation at that

6    time.

7                MR. HYDE:  State investigation.

8                THE COURT:  Metro investigation?

9                MR. HYDE:  Metro Narcotics, yes, sir.

10               THE COURT:  All right.  Not -- all right.  Go ahead.

11               MR. HYDE:  The weapons were alleged to have been used

12   in furtherance of the crime.  We were looking to make that

13   particular charge.  We were requesting that the weapons be

14   submitted to the ATF -- Alcohol, Tobacco, and Firearms -- for

15   an interstate nexus examination.  And I believe --

16               THE COURT:  Well, you say "we."  In July of '06, when

17   did the federal government law enforcement agencies become

18   involved?  Were they involved in the raid on the homes?

19               MR. HYDE:  No, sir, we were not.

20               THE COURT:  Okay.

21               MR. HYDE:  That was a raid of opportunity.  We had no

22   prior knowledge that that was going to occur.

23               THE COURT:  When did the federal government first

24   become involved, law enforcement?

25               MR. HYDE:  I can't say exactly when.  I do know that

1   at some point it was presented to us for possible prosecution.

2   What we needed as far as the weapons were concerned was we

3   needed additional information to establish an interstate nexus

4   between the weapons and the crime.  We requested that.  That

5   was not forthcoming.  It was -- a decision was made to go ahead

6   and present it to the grand jury after the interstate nexus was

7   not made available, and it just took as long as it took.

8           Now, there was a co-defendant who was arraigned and,

9   in fact, pled guilty on October 31, 2008, which would have been

10  about a year and three months after the alleged commission of

11  the crime.  The DEA was actively searching for Mr. Curtis

12  Williams and, in fact, issued a fugitive warrant for him at one

13  time because they couldn't find him.  So that goes to some

14  extent to explain why he was arrested so much later than his

15  co-defendant.  In fact, again, the co-defendant Jenkins was --

16  received a first appearance hearing on October 31, '08, whereas

17  Mr. Williams was not arraigned and had a first appearance

18  hearing until almost a year later, September 28, 2009.

19          THE COURT:  Is the government's position that that

20  delay was attributable to them not being able to find him?

21          MR. HYDE:  That is correct, yes, sir.

22          THE COURT:  All right.  So up until the co-defendant

23  was -- made his initial appearance, do you have any indication

24  as to the reason for that delay?

25          MR. HYDE:  Yes, sir.  Again, that was the -- that was

1   our request, the government's request, to try to get some

2   additional evidence or some additional information about the

3   handguns.  When that was not forthcoming, we made the decision

4   to go ahead and present it -- the case to the grand jury

5   without the firearms charges.  For that very reason the case

6   was getting old.

7             THE COURT:  And he ultimately was not charged with

8   the firearm charge?

9             MR. HYDE:  No, he was not, Your Honor.

10             THE COURT:  Does the government not think it would be

11   important for the record on appeal to contain the evidence as

12   you have just described it, explaining the delay, in case they

13   are -- I don't want this thing to go up on appeal and then

14   remand it back and say the record is deficient as to why the

15   government delayed.  Wouldn't it be better to have that record

16   thoroughly completed before that happens?

17             MR. HYDE:  Yes, sir, I believe it would.

18             THE COURT:  All right.  Who would be the person that

19   would really -- could testify to that and be subject to cross-

20   examination?

21             MR. HYDE:  Special Agent John Memmo, Metro Narcotics.

22             THE COURT:  Okay.  How long do you think it would

23   take for him to be available?

24             MR. HYDE:  On direct, five minutes.  He's here.

25             THE COURT:  Is he up to speed on it?  Is he prepared

1    to testify about it?  I mean, do you want to confer with him?

2    I don't know if he knew he was going to have to be here.

3              MR. HYDE:  He knew there was a possibility that he

4    would testify to these limited --

5              THE COURT:  I think it's important to have on the

6    record why the delay -- why we had the delay, what it was, and

7    then the record will be complete.  And I think that person

8    needs to be available to be cross-examined.  Do you want to go

9    ahead and proceed with that now?

10             MR. HYDE:  Yes, sir.

11             THE COURT:  Okay.  Call Agent Memmo.

12             Sir, come to the witness stand, please.  Raise your

13   right hand and take the oath.

14             JONATHAN MEMMO, GOVERNMENT'S WITNESS, SWORN.

15             THE COURT:  Please be seated.  State your name for

16   the record, and spell it for the court reporter.

17             THE WITNESS:  Jonathan Memmo, M-e-m-m-o.

18             THE COURT:  All right, Mr. Hyde.

19                        DIRECT EXAMINATION

20   BY MR. HYDE:

21   Q.  Agent Memmo, how are you employed?

22   A.  I'm employed by the Columbus Police Department, assigned to

23   Metro Narcotics and the DEA Task Force.

24   Q.  And were you so employed by Metro Narcotics or working with

25   Metro Narcotics back in July 2006?

1    A.  Yes, sir, I was.

2    Q.  I'd like to turn your attention to the date of July 14,

3    2006.  On that date did you personally participate in the

4    execution of search warrants at 1417 and 1419 29th Street?

5    A.  I did.

6    Q.  Are those locations in Columbus, Georgia?

7    A.  They are.

8    Q.  And was a search warrant obtained prior to searching those

9    premises?

10   A.  Yes, sir.

11   Q.  As a result of your search, were any drugs recovered?

12   A.  Yes, sir.  A substantial amount of crack and powdered

13   cocaine and marijuana.

14   Q.  And in addition, was a firearm or firearms also recovered

15   inside either of those residences?

16   A.  Yes, sir, there was.

17   Q.  Can you describe to the Court what they were?  Do you

18   recall?

19   A.  Referring to my report, there was a 12-gauge shotgun that

20   was recovered.  There was a H&R .22 revolver -- actually, there

21   were two H&R .22 revolvers located at 1417 29th Street.

22   Q.  Was the defendant, Mr. Curtis Williams, present whenever

23   those firearms were -- or, rather, whenever those search

24   warrants were executed?

25   A.  Yes, sir, he was.

1  Q.  And, in fact, had he been detained outside the home prior

2  to the execution of the warrants?

3  A.  He had been placed under arrest, yes, sir.

4  Q.  What initially was he placed under arrest for?

5  A.  We'd received information that Curtis Williams, known as

6  Big Curt, was selling drugs from those two locations at night,

7  that he was driving a van.  In our background check of him, he

8  had an outstanding felony probation violation.

9      We went to that location.  Agents observed him coming out

10  of the residence.  He was initially asked what his name was.

11  He gave the name of Omar Sharif.  He was placed under arrest

12  for false information and also for the probation violation.

13  Q.  So after the execution of the search warrant, in addition

14  to the false name arrest, were other charges added to

15  Mr. Williams's booking sheet?

16  A.  Yes, sir.

17  Q.  Such as?

18  A.  Trafficking in cocaine, possession of marijuana with the

19  intent to distribute, possession of a firearm by a convicted

20  felon, possession of a firearm during the commission of a

21  crime, possession of a destructive device -- there was a

22  grenade simulator found; that's what that was -- violation of

23  the Georgia Controlled Substance Act, Schedule I, Ecstasy --

24  there were four and a half tablets of Ecstasy found -- and the

25  false information charge.

1   Q.  Now, at that time -- and by "at that time," I mean on July

2   14, 2006 -- all these charges leveled against Mr. Williams were

3   state charges; is that correct?

4   A.  That is correct.

5   Q.  Prior to the execution of that search warrant, had you or

6   any other member of your unit contacted the federal government

7   to inform the federal government that this particular raid or

8   search was going to take place?

9   A.  No, sir.

10  Q.  At some point -- and I don't expect you to remember this

11  with any exactness, but at some point after the search did you

12  or someone in your office contact us about perhaps picking up

13  the case, for lack of a better term?

14  A.  Initially we contacted -- we were not part of the DEA Task

15  Force at that time.  We had contacted Agent Steve Ribolla, who

16  was with the DEA, and presented it to him.  And he agreed to

17  look into the case and to present it to the government.

18  Q.  And do you recall --

19          THE COURT:  Let me ask you this, Agent Memmo.  So he

20  was taken into custody on July the 14th of 2006.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  And taken into state custody --

23          THE WITNESS:  Yes, sir.

24          THE COURT:  -- in Muscogee County.

25          THE WITNESS:  Yes, sir.

1          THE COURT:  Would he not have had counsel for the

2   state proceedings to make his bond?  I mean, would he have

3   not -- would he have retained somebody or somebody been

4   appointed for him in the state system near that date?

5          MR. HYDE:  He would've had a Recorder's Court hearing

6   within three days of his arrest.  At that time at least

7   appointed counsel would have been present to represent him.

8          THE COURT:  Would you have been -- do you have any

9   information as to whether that occurred, Agent Memmo, based on

10  your experience?

11         THE WITNESS:  Yes, sir.  Based on my experience and

12  going off my memory, his Recorder's Court hearing was the

13  following day, the 15th of July, at 2 p.m.  I do not recall off

14  the top of my head whether -- he would have been afforded

15  counsel.  Whether he actually took that opportunity or not, I

16  don't recall.

17         THE COURT:  All right.  And did he bond out?

18         THE WITNESS:  He eventually -- he initially was

19  given -- was not given a bond on the trafficking cocaine

20  charge.  Eventually I think a bond was granted by superior

21  court.  I do not know how long he stayed in jail.

22         THE COURT:  But during that period he would certainly

23  have a right to counsel.

24         THE WITNESS:  Oh, yes, sir, definitely.

25         THE COURT:  And counsel would have known he was being

1    charged with these serious state offenses.

2              THE WITNESS:  Yes, sir, that's correct.

3              THE COURT:  And could have done any investigation at

4    that time had they chosen to do so.

5              THE WITNESS:  I would think so, yes, sir.

6              THE COURT:  I mean, the statement was made earlier

7    that he didn't have counsel until his initial appearance in

8    federal court, and I assume that reference meant he didn't have

9    counsel on the federal charges until that time.  But clearly as

10   to these drug offenses he had an opportunity for counsel as

11   early as July 14th of 2006.

12             THE WITNESS:  Yes, sir, that's correct.

13             THE COURT:  Or July 15th.

14             THE WITNESS:  Yes, sir.

15             THE COURT:  Okay.  Go ahead.

16   BY MR. HYDE:

17   Q.  One final thing, Agent Memmo.  Would you please explain to

18   the Court as best you can recall what discussion or discussions

19   occurred between you and the federal government about having

20   these firearms examined?

21   A.  Yes, sir.

22             THE COURT:  Do you have a record there as to when you

23   first made contact with the federal folks?

24             THE WITNESS:  No, sir, I don't have an exact date,

25   no.

1            MR. HYDE:  Your Honor, in all fairness to Mr. Memmo,

2    those discussions probably did occur between Agent Ribolla and

3    myself, as opposed to between Agent Memmo and me.  Agent Memmo

4    may have spoken to Agent Ribolla about it, but I'm not quite

5    sure he ever spoke to me about it.

6            THE COURT:  Well, I'm just trying to see if there's

7    any indication as to when the federal government first began

8    involved in potential investigation, and I'm not necessarily

9    looking for an exact date but just -- is there any way to tell

10   when the federal folks starting assisting with any part of the

11   investigation?

12            Your file doesn't indicate that, Agent Memmo?

13            THE WITNESS:  No, sir, it does not.

14            THE COURT:  Okay.  Was the main purpose in contacting

15   Ribolla to investigate the weapons aspect of it, or was it also

16   the potential of it becoming a federal case?

17            THE WITNESS:  The potential based upon the fact that

18   Mr. Williams was a convicted felon, there were guns found, and

19   there was a substantial amount of drugs involved.

20            THE COURT:  All right.  Go ahead, Mr. Hyde.

21   BY MR. HYDE:

22   Q.  Do you have any recollection of having any conversation

23   with either myself or with Mr. Ribolla about having these

24   firearms examined for purposes of federal prosecution?

25   A.  Yes, sir, I do.

1  Q.  And what exact -- what do you recall about that matter?

2  A.  Basically I recall that the firearms -- the information had

3  been submitted to the ATF and that results were -- were waiting

4  for results or information based upon their investigation, and

5  that was slow in coming.  And then eventually we had a

6  conversation about the fact that we decided to proceed without

7  the weapons charges.

8          MR. HYDE:  That's all I have, Your Honor.

9          THE COURT:  Was it your understanding that you were

10  going to proceed without the weapons charges because you still

11  hadn't gotten back the necessary information from ATF?

12          THE WITNESS:  Yes, sir, that's correct.

13          THE COURT:  So it's your testimony that you talked to

14  the federal agent, Ribolla, with the idea of pursuing the gun

15  charges federally; and it continued to rock along, and you

16  didn't get any response back on -- from ATF on that.  So at

17  some point you just said we can't wait any longer, let's go

18  ahead and proceed without the weapon charge?  Is that how it

19  went?

20          THE WITNESS:  Well, actually -- I mean, initially it

21  started with Agent Ribolla, but the conversations toward the

22  end were with Mr. Hyde.  And it was his contention that it had

23  taken this long for the -- for no results with the weapons,

24  that we should go ahead and proceed on what we had, and I

25  concurred.

```
 1              THE COURT:  Okay.  Was there anything about the delay
 2   that there was any intent to obtain some tactical advantage by
 3   delaying it?
 4              THE WITNESS:  No, sir.
 5              THE COURT:  During this delay, as far as you know,
 6   were the state charges still pending against him, or had they
 7   been dismissed in some way?
 8              THE WITNESS:  Going by recollection, Your Honor, when
 9   he was indicted federally, I believe the state charges were
10   dead docketed.
11              THE COURT:  Okay.  But up to the time he was indicted
12   the state charges were still pending against him.
13              THE WITNESS:  Yes, sir, that's correct.
14              THE COURT:  And -- okay.  Go ahead, Ms. Roseberry.
15   Any cross-examination?
16              MS. ROSEBERRY:  Sure.
17                        CROSS-EXAMINATION
18   BY MS. ROSEBERRY:
19   Q.  Agent Memmo, when you say that the state charges were still
20   pending up until the time Mr. Williams was indicted, were you
21   still involved with the state charges?
22   A.  Involved to what extent?
23   Q.  You were the agent in this case?
24   A.  I was one of the agents, yes.
25   Q.  You were there when the arrest took place?
```

1   A.   Yes.

2   Q.   You were there when the search warrant was executed?

3   A.   Yes.

4   Q.   Did you continue to be involved in the state case in a

5   likewise manner?

6   A.   I was -- as the case agent, yes.

7   Q.   You were the case agent?

8   A.   Yes, ma'am.

9   Q.   Okay.  So as the case agent, did you have any active

10  involvement in the state case while you were waiting for the

11  gun results?

12  A.   I'm not exactly sure what you're asking as far as actual

13  involvement.

14  Q.   Okay.  What would you normally do in a case after the

15  arrest and the indictment in the state?

16  A.   On the state level --

17  Q.   Yes, sir.

18  A.   -- once the case is turned over to the district attorney's

19  office, then it's up to the district attorney's office at that

20  point.  If there's any background investigation on my part,

21  then I would do that.

22         THE COURT:  Just so the record is clear, he was

23  indicted on the state charges?  Is that true?

24         THE WITNESS:  I do not recall, Your Honor, if he was

25  indicted on the state charges or not.

1           THE COURT:  Okay.

2    BY MS. ROSEBERRY:

3    Q.  Do you recall if you took any other action on the state

4    case after the guns went out to be examined?

5    A.  Well, the guns were logged in to our evidence.  And once

6    the information was turned over to state -- to Agent Ribolla

7    for the federal part of it, as far as the state involvement, I

8    notified our district attorney's office that the federal

9    government was looking to adopting the case and that when I got

10   affirmation on that I would let them know.

11   Q.  Okay.  I just want to make sure I understand.  After you

12   turned the information over to the district attorney's office

13   in the state case, did you take any other action in the state

14   case?  Were you involved in any kind of way?

15   A.  Not that I'm aware.  I'm not exactly sure what you're --

16   what action you're asking was I involved in.

17   Q.  Any action at all --

18   A.  Normally --

19   Q.  -- in your official capacity as the case agent in that

20   case.

21   A.  Once again, you're -- it's kind of a broad question you're

22   asking.  I'm not exactly sure what you're saying, what type

23   other action.

24   Q.  Okay.

25   A.  Normally what -- normally the way the case works, a case is

1  made; it's turned over to the district attorney's office; and
2  then it's up to them to proceed with it; and they contact us as
3  far as times for grand jury, times for preliminaries, times for
4  trial, that type of thing.
5  Q.  Okay.  Do you recall ever going to the grand jury on this
6  case?
7  A.  I cannot recall if this case was indicted in the state
8  level, no.
9  Q.  Okay.  Do you recall if the D.A. contacted you to do
10 anything else on this case?
11 A.  I do not recall them contacting me.
12 Q.  Okay.  Now, you said that the guns were seized during the
13 search.  Right?
14 A.  Yes.
15 Q.  How soon after the guns were seized did you speak with
16 federal prosecutors about the case?
17 A.  Okay.  As far as federal prosecutors, I had not spoken with
18 Mel Hyde in exactly -- initially I spoke to Agent Ribolla.
19 Q.  I'm sorry.  How soon after did you speak with Agent
20 Ribolla?
21 A.  I don't recall.
22 Q.  You don't recall?
23 A.  No, ma'am.
24 Q.  Would it have -- could it have been before you found out
25 there was no information on the guns?

1    A.   No information on the guns.

2    Q.   You mentioned earlier that you were waiting for information

3    to come back on the guns.   Right?

4    A.   We -- any gun that is seized, we put an application to the

5    ATF --

6    Q.   Yes, sir.

7    A.   -- for a trace on it.

8    Q.   So when you spoke --

9    A.   I spoke to him prior to -- we never did receive some of the

10   information from ATF, to my knowledge.   So I wouldn't have

11   spoken to Agent Ribolla before that, because it never occurred.

12   Q.   Okay.   Would you have spoken to him before that application

13   to find out the background of the guns was made?

14   A.   Probably not, because as a normal course any gun that's

15   seized there's a form filled out, a trace form, that's -- for

16   normal process is sent in.   So...

17   Q.   Okay.   How soon after you seized the guns did you fill out

18   the trace form?

19   A.   When the guns were turned in to evidence, a trace form's

20   turned in with them.

21   Q.   How soon did you turn the guns in to evidence?

22   A.   Let me see if it has the exact date.

23        It does not have the exact date in the report.   It would

24   have been within a matter of a few days, though.

25   Q.   A few days of --

1   A.  The arrest.

2   Q.  Of the arrest.  Okay.  And then I think you said -- tell me

3   if I'm saying this wrong -- that before the application for the

4   trace was made, you would have talked with Agent Boland?

5   A.  Agent Ribolla?

6   Q.  Ribolla.  I'm sorry, yes.

7   A.  No.  As the normal course of seizure of any weapon, an ATF

8   trace is turned in.  However, in order for a gun to be taken in

9   the federal system, a nexus has to be done.  I don't believe

10  that is part of the normal trace.

11  Q.  Okay.

12  A.  So you're looking at two different things, is what you're

13  looking at.

14  Q.  Okay.  So how soon after requesting the background

15  information did you speak with Agent Ribolla?

16  A.  Okay.  I don't recall exact -- it was probably within -- I

17  don't recall what time frame I spoke to Agent Ribolla.

18  Q.  Could it have been a month?

19  A.  I don't believe so, but possibly.  I wouldn't say it was

20  any longer than that, no.

21  Q.  Okay.  No longer than a month?

22  A.  I would guess, just working off my memory, no.

23  Q.  Okay.  And what was your understanding of Agent Ribolla's

24  role in the case?

25  A.  At that time Agent Ribolla was assigned to the DEA office

1  here in Columbus.  He was our -- he was the one that worked
2  with our task force.
3  Q.  Okay.
4  A.  Whenever a case was made that we felt could be adopted in
5  the federal system, he was our contact person.
6  Q.  Okay.  And so was that your reason for talking with Agent
7  Ribolla within that 30 days, because you felt like there was --
8  it may have been a federal case?
9  A.  Myself and my supervisors, yes.
10 Q.  Okay.  And then when is it that you understood that Agent
11 Ribolla spoke with Mr. Hyde or other prosecutors in Mr. Hyde's
12 office?
13 A.  I don't know when he spoke with them.
14 Q.  Okay.  You never spoke with Mr. Hyde or anybody in the
15 office directly?
16 A.  Initially, no.  That was not our -- not the way it worked.
17 Q.  Okay.  When you say "initially," that suggests at some time
18 you did; right?
19 A.  The reason I say "initially" is in December of '07 we
20 became part of the DEA Task Force.  Therefore, when we make a
21 case now, I have the authority and the option of contacting
22 Mr. Hyde directly.  I don't have to go through anybody within
23 the DEA.
24 Q.  Okay.  So as of December '07, you had contact with the
25 federal agents directly?

1  A.  December of '07, we became part of the DEA Task Force.

2  Q.  Okay.  And when you say you became part of the task force,

3  can you tell me what that means?

4  A.  We were sworn in by the federal government as DEA Task

5  Force agents.

6  Q.  Okay.  And that meant that you can conduct investigations

7  as federal agents at that point in time?

8  A.  That is correct.

9  Q.  And that means that you could have conducted an

10  investigation in this case as a federal agent as of December of

11  '07?

12  A.  That's correct.  However, this case had already been turned

13  over to Agent Ribolla at that time.  It was his case.

14  Q.  It wasn't your case?

15  A.  The federal part of it, no, ma'am.

16  Q.  But the state case was yours?

17  A.  Yes.

18  Q.  Now, in December of '07, did you work on the same DEA Task

19  Force with Agent Ribolla?

20  A.  Yes.

21  Q.  Okay.  Physically, were your offices in the same place?

22  A.  Our office stayed in the same place.

23  Q.  Okay.  How often did you have contact with Agent Ribolla

24  after you became a federal agent?

25  A.  Once every couple of weeks probably.

1  Q.  Okay.  At the time -- I'm going to go back to when you --
2  you say you put the application in to trace the gun.  Would
3  that have been before when you said Mr. Curtis Williams was
4  given a bond or after?
5  A.  I think I've answered this several times, but I'll try it
6  one more time to make it clear.
7  Q.  I'm sorry.  I just didn't understand you.
8  A.  Obviously I'm not getting it across.
9      Any time a weapon is seized, when it's turned in to our
10  property and evidence room, we fill out an ATF trace form.  So
11  there is an ATF trace form filled out within a matter of a few
12  days.  However, as far as for the federal charges, there's a
13  nexus that's needed, which I had no part of that.  Agent
14  Ribolla contacted Mr. Hyde in reference to that.
15  Q.  Okay.  On direct --
16  A.  I don't know if I can make it any clearer than that.
17  Q.  On direct a little while ago, you mentioned that Mr. Curtis
18  Williams was initially not given a bond.  Do you remember that?
19  A.  Yes.
20  Q.  And then you mentioned that later he got a bond.  Do you
21  remember that?
22  A.  Yes.  He eventually got out of jail.  So he would have
23  gotten a bond, yes.
24  Q.  Okay.  And what I'm trying to establish is when he got the
25  bond in relation to when you filled out that trace form.

1    A.   The trace form was filled out within a matter of a couple

2    of days.   I do not know the exact date he got a bond.

3    Q.   Okay.   When you say initially he didn't get a bond, what do

4    you mean by that?

5    A.   The first initial appearance in Columbus in the state

6    system is in Recorder's Court.   It's maintained by Recorder's

7    Court judges.   They do not have the authority to set bonds on

8    certain offenses, one being trafficking in cocaine.   So the

9    judge at that point did not have the authority to set a bond.

10   Q.   Okay.   Now, before you became a federal agent, as the state

11   agent you would've had access to the Columbus police records;

12   is that correct?

13   A.   Yes.

14   Q.   And you would've had access to the records that are kept

15   with respect to who is in custody and who is not in custody; is

16   that right?

17   A.   No, ma'am, that's incorrect.

18   Q.   You couldn't access who was in custody when you were --

19   A.   The jail system is maintained by the Muscogee County

20   Sheriff's Department.

21   Q.   Did you have access as an agent with the Columbus Police

22   Department to who was in custody and who was not in custody?

23   Did you have access to that information?

24   A.   I had access to persons in the Muscogee County Sheriff's

25   Department that could let me know if somebody was still in jail

1    or not, yes.

2    Q.  Okay.  So if you wanted to know when Mr. Williams was

3    released, you would've had access to that information?

4    A.  Yes.

5    Q.  Okay.  And that access didn't cut off when you became a

6    federal agent, did it?

7    A.  No, it did not.

8              MS. ROSEBERRY:  May I have a moment, Your Honor?

9              THE COURT:  Yes.

10   BY MS. ROSEBERRY:

11   Q.  I think you were trying to explain to me the difference

12   between the trace form that you used and the act of finding out

13   the nexus.

14   A.  Yes, ma'am.

15   Q.  Okay.  So I want to find out from you what action you took

16   or anyone in your office took with respect to getting the nexus

17   information.

18   A.  I had nothing to do with that.

19   Q.  Who would've conducted that activity?

20   A.  The ATF is the one that actually does the nexus, but Agent

21   Ribolla would have been the one initially to speak with

22   Mr. Hyde in reference to the federal aspect of it.

23   Q.  Okay.  Now --

24             THE COURT:  When you use the term "nexus," you're

25   talking about connection of the firearm to interstate commerce,

```
 1   travel --
 2              THE WITNESS:  Yes, sir.
 3              THE COURT:  -- traveling interstate?
 4              THE WITNESS:  Yes, sir, that's correct.
 5              THE COURT:  That's what we're talking about when we
 6   talk about "nexus."
 7              THE WITNESS:  We are, yes, sir.
 8              MS. ROSEBERRY:  Thank you, Your Honor.
 9              THE COURT:  Go ahead.
10   BY MS. ROSEBERRY:
11   Q.  And prior to December '07, did you and Agent Ribolla have
12   this same physical office space?
13   A.  We maintained our space at Metro Narcotics.  When we were
14   over, we did not have any joint office space, no.
15   Q.  Okay.  So when did you get the joint office space?
16   A.  After we were sworn in as agents, we did not have -- they
17   provided us a space up there, but we did not maintain our
18   office at the DEA.  Our office is maintained at Metro
19   Narcotics.
20   Q.  Both you and Agent Ribolla?
21   A.  No.  Agent Ribolla is with the Drug Enforcement
22   Administration.  I am with the Columbus Police Department,
23   assigned to Metro Narcotics, also assigned to the DEA Task
24   Force.
25   Q.  I see.  Thank you for clearing that up for me.
```

1    A.   Okay.

2    Q.   So prior to your becoming a federal agent, how often did

3    you have contact with Agent Ribolla?

4    A.   Sporadically at best.

5    Q.   Okay.  And when you say "sporadically," can you try to pin

6    that down for me?

7    A.   Well, I can't give you an exact date or exact period of

8    time.  Whenever a case came up that we thought would be

9    involved as far as a -- in the federal level, we would have

10   contact with Agent Ribolla.

11   Q.   Okay.  And so you had a contact number for him?

12   A.   Yes.

13           MS. ROSEBERRY:  Okay.  And I think I don't have

14   anything else, Your Honor.  That's it.

15           THE COURT:  Mr. Hyde, anything else of this witness?

16           MR. HYDE:  Just a little bit, Your Honor.

17                       REDIRECT EXAMINATION

18   BY MR. HYDE:

19   Q.   Agent Memmo, a trace -- an ATF trace would be something you

20   would do routinely in every case, is that correct, if guns were

21   discovered?

22   A.   Yes, sir, every case involving the recovery of a firearm.

23   Q.   On the other hand, an interstate nexus examination or in

24   fact a test-firing examination would be things that would have

25   to be specifically requested from the ATF; is that correct?

1   A.  Yes, sir, that is correct.

2              MR. HYDE:  Thank you.

3              THE COURT:  And just so the record is complete, the

4   ATF trace that is done in every case, that is intended to

5   determine whether the gun is stolen?

6              THE WITNESS:  Well, whether it's stolen or if it had

7   been used possibly in a crime, that type of thing.

8              THE COURT:  And the other trace that led to the delay

9   in this case is a trace that they do to show that the gun

10  traveled from one state to another.

11             THE WITNESS:  Yes, sir, that's correct.

12             THE COURT:  And your experience has been that that

13  type of trace takes longer than the initial trace?

14             THE WITNESS:  Yes, sir.

15             THE COURT:  Okay.  All right.

16             MS. ROSEBERRY:  Your Honor, may I just clarify?

17             THE COURT:  Yes.

18                      RECROSS-EXAMINATION

19  BY MS. ROSEBERRY:

20  Q.  Can you tell us -- when you say it takes longer than the

21  initial trace, how long?

22  A.  It can take well over a year sometimes.

23             THE COURT:  All right, sir.  You may step down.

24             THE WITNESS:  Thank you.

25             THE COURT:  Anything else, Mr. Hyde?

1            MR. HYDE:  No, Your Honor.

2            THE COURT:  Anything else from the defendant?

3            MS. ROSEBERRY:  No, Your Honor.  We'd just like an

4    opportunity to brief this matter in light of this testimony

5    that was just received.

6            THE COURT:  You want to do a supplemental brief --

7            MS. ROSEBERRY:  Yes, sir.

8            THE COURT:  -- based on what transpired in the

9    hearing?

10           MS. ROSEBERRY:  Yes, sir.

11           THE COURT:  I don't see any harm in that, Mr. Hyde.

12   The case is going to be dismissed one way or the other, without

13   prejudice or with prejudice.  So if you want to file a

14   supplemental brief -- either side wants to file a supplemental

15   brief, you can do it within 14 days of today.

16           MS. ROSEBERRY:  Thank you, Your Honor.

17           THE COURT:  Anything else, Mr. Hyde?

18           MR. HYDE:  No, Your Honor.

19           THE COURT:  Ms. Roseberry?

20           MS. ROSEBERRY:  No, Your Honor.

21           THE COURT:  Okay.  We're running behind, but we will

22   soon catch up.  We're going to take a 15-minute break, and then

23   we're going to come back with our plea hearing.  We've got one

24   plea that we're going to take, and then after that we'll take

25   up the revocation proceeding.  We're going to get that all done

1    before anybody goes to lunch.  So we will take 15 minutes and

2    be back for those two items.  We're in recess.

3            (Proceedings Concluded)

4                      CERTIFICATE OF REPORTER

5               I, Betsy J. Peterson, Official Court Reporter of
     the United States District Court, in and for the Middle
6    District of the State of Georgia, Columbus Division, a
     Registered Professional Reporter, do hereby CERTIFY that the
7    foregoing proceedings were reported by me in stenographic
     shorthand and were thereafter transcribed under my direction
8    into typewriting; that the foregoing is a full, complete, and
     true record of said proceedings.

9

10                           This 1st day of March, 2010.

11

12                      _____
                        S/Betsy J. Peterson, RPR,CCR
13                      Federal Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25